UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| RONALD E. WILLIAMS, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:16-cv-00885-SEB-MJD |
| | ) |
| HERMAN CASTELLON, et al. | ) |
| | ) |
| Defendants. | ) |

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DKT. 74)**

Plaintiff Ronald E. Williams, Jr. ("Williams"), brought this action *pro se* under 42 U.S.C. § 1983 against Defendants, officers at the Marion County, Indiana, jail ("the Jail"), for deliberate indifference to serious risk of harm in violation of the Eighth Amendment to the Constitution. Now before the Court is Defendants' motion for summary judgment, to which Williams responded *pro se* after receiving notice under *Timms v. Frank*, 953 F.2d 281 (7th Cir. 1992), and our Local Rule 56-1(k), though he has since retained counsel. For the reasons explained below, Defendants' motion is granted in part and denied in part.

**Background**

Williams is a prisoner at the Wabash Valley Correctional Facility ("Wabash Valley"), an Indiana penitentiary. In 2009 and 2010 Williams was detained at the Jail awaiting trial on charges for which he was subsequently convicted and is currently incarcerated. In the prosecution of that case, Williams cooperated with the state against his codefendant, a man named Jamal Hurst, alias Emilio Mitchell ("Hurst"). During his

1

detention, Williams was kept in administrative segregation, that is, in solitary confinement, for his protection as a cooperating witness. On October 13, 2010, Williams was sentenced to a fifty-five year term, fully executed, in the Indiana Department of Correction. Williams was then transferred to Wabash Valley.

On June 15, 2015, Williams was transported from Wabash Valley to the Jail in advance of a hearing on his petition for postconviction relief then pending before the Marion County courts. On arriving at the Jail, Williams told the book-in officer that he wished to be placed back in administrative segregation, as he had been in 2009 and 2010. Williams feared that his prior cooperation with the state might be known to other Jail inmates via Hurst and put him at risk of violence at their hands, though he was unaware of any specific threat to himself. Williams did not explain his reasons for wishing to be placed in segregation to the book-in officer.

The book-in officer responded that the Jail's classification department "knew, and they would handle everything," and that Williams would be taken to an appropriate cell. Williams Dep. 43:10–11. Williams pressed the officer, "Man, you sure, you know, I'm trying to go to [segregation.]" *Id.* 43:14–15. And also, "Man, I'm a little worried, I'm not from here, you know, I've been in [segregation] this long, that's what I'm used to, I would rather go back there." *Id.* 28:21–24. The officer replied, "Yeah, classification— they know everything." *Id.* 43:16. Williams relented and was escorted by a second officer to a cell in the Jail's general population. When Williams realized he was not being taken to segregation, he again expressed his wish to be placed there to the officer escorting him, but to no avail. We refer to these two officers collectively as "the book-in officers."

The next day, June 16, 2015, just before supper, Williams was recognized by a Jail inmate he knew as "T-Bone." The two men had been in the same segregation block in 2009 and 2010, and T-Bone knew Hurst. At supper-time, Williams ate and was on his way back to his cell through the day room of his cell block when he was "blindsided" by "at the minimum seven people." *Id.* 83:24, 84:1–2. Seven inmates attacked Williams in an area of the Jail Williams insists would have been visible to the Jail's security cameras and thus visible to officers manning the cell block's or the Jail's control booth ("the control-booth officers"), which housed a bank of closed-circuit televisions fed from the security cameras. Williams attempted to flee into his cell but his attackers followed him there and continued their assault, beating him with a plastic toilet brush.

Williams's assailants covered him with a blanket and kept him in the cell, ordering him not to say or do anything as they watched a basketball game. Apparently (the facts are somewhat muddled on this point) Williams remained in his cell with his assailants for hours. No Jail staff stand regular posts or maintain a regular presence in the cell blocks. Security cameras are the Jail's chief means of surveilling its inmates, supplemented by hourly "tier checks," walk-throughs of the cell block conducted by one Jail officer. *See id.* 87:23–88:6, 102:19–103:6. Williams was "not sure that [Jail staff] did [a tier check]" while he was being held captive by his assailants, because "at that time [he] was just . . . l[y]ing there under a blanket[,] . . . bleeding[.]" *Id.* 88:6–10.

Shortly before the nightly "lock-down" of the Jail, around 10:30 p.m. or 11:00 p.m., Williams's assailants told him to "get out of [t]here" (though how Williams could have been ejected from his own cell is unclear). *Id.* 89:18.

3

> [S]o at that time [Williams] went into the sally port or whatever and [he] had [his] head wrapped in a T-shirt, and the officers were already on their way to pick up another person because they said his family had called in saying [threats had been made] towards him, so they thought [Williams] was him at first until [Williams] informed them no, [he was] not him, [he was] different.

*Id.* 89:18–25.

Sometime after his assault, while still at the Jail, Williams learned the identity of one of his assailants, a man named Richard Grundy ("Grundy"), said to be the leader of a gang and friends with Hurst. Williams was also informed that inmates at the Jail had been in communication with Hurst, who was then at liberty. Williams's cell mate explained to him that the assault had been premeditated.

Williams suffered four lacerations to his head, a fractured nose, and a fractured orbital. After a trip to the Jail's medical unit, Williams was transported to a local hospital, where he was treated overnight. He was returned to the Jail the next day and transported back to Wabash Valley on the day after that, his postconviction-relief hearing having been canceled. Williams has not lodged any complaint that he received inadequate medical treatment either at the Jail, the hospital, or Wabash Valley.

This lawsuit followed. The now operative amended complaint was filed on August 15, 2016. Dkt. 16. After limited discovery, Defendants moved for summary judgment on the single issue of failure to exhaust administrative remedies, Dkt. 29, which motion we denied. Dkt. 40. The instant motion was filed on December 11, 2017, Dkt. 74, and is now fully briefed and ripe for decision.

On March 27, attorney John Andrew Goodrich filed an appearance on Williams's behalf. Dkt. 87. Nothing at all has been heard from Attorney Goodrich since he appeared, a troubling fact given the pendency of a dispositive motion his client has defended entirely *pro se*.

## **Standard of Decision**

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

## **Analysis**

To recover under 42 U.S.C. § 1983, a plaintiff "must demonstrate that the individual defendants: (1) acted under the color of state law; and (2) deprived him of a constitutional right." *Estate of Perry v. Wenzel*, 872 F.3d 439, 452 (7th Cir. 2017) (citing *Colbert v. City of Chicago*, 851 F.3d 649, 656 (7th Cir. 2017)). Defendants' motion for summary judgment is directed to Williams's constitutional injury only, so we proceed directly to the Constitution.

5

The Eighth Amendment, incorporated against the states by the Fourteenth Amendment, protects persons under sentence from cruel and unusual punishments. U.S. Const. amend. VIII, cl. 3; *Berry v. Peterman*, 604 F.3d 435, 439 (7th Cir. 2010). A jail officer's "'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1995).

A jail officer may be liable for his deliberately indifferent "fail[ure] to protect an inmate from another prisoner" if the officer "'knows of and disregards an excessive risk to inmate health or safety[.]'" *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (quoting *Farmer*, 511 U.S. at 837). Such a claim "has both an objective and a subjective component." *Id.* (citing *Farmer*, 511 U.S. at 837).

First, the risk "must be an objectively serious one." *Id.* (citing *Farmer*, 511 U.S. at 837). Second, the officer "must have actual, and not merely constructive, knowledge of the risk in order to be held liable; specifically, he 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference.'" *Id.* (quoting *Farmer*, 511 U.S. at 837). This presents "a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a [jail officer] knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (citation omitted).

Here, there is no genuine dispute that the book-in officers did not consciously disregard a known risk of serious harm to Williams when they booked him into the Jail on June 15, 2015. Summary judgment is therefore appropriate as to that theory of

6

liability. However, Defendants have failed entirely to address a theory raised by Williams's complaint and supported by Defendants' own evidentiary designations: that the initial assault on Williams in the day room of the cell block on June 16, 2015, was observed by the control-booth officers, but disregarded by them. Because Defendants have failed to carry their initial burden as to this theory, summary judgment must be denied to that extent.

I. **No Reasonable Jury Could Find That the Book-In Officers Consciously Disregarded a Known Risk of Serious Harm to Williams**

Objectively, "a beating suffered at the hands of a fellow detainee," such as Williams suffered, "clearly constitutes serious harm, as 'being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society.'" *Brown v. Budz*, 398 F.3d 904, 910–11 (7th Cir. 2005) (alteration omitted) (nested quotation marks omitted) (quoting *Farmer*, 511 U.S. at 834). And, crediting Williams's account of Hurst's motive and opportunity for retaliation against Williams, we assume that a reasonable jury could find not only the magnitude of the risk, but also its likelihood to be objectively sufficiently serious. *See Grieveson v. Anderson*, 538 F.3d 763, 775 (7th Cir. 2008) (assuming risk of retaliatory assault sufficiently serious). *Compare Estate of Simpson v. Gorbett*, 863 F. 3d 740, 745–47 (7th Cir. 2017) (finding magnitude but not likelihood of harm sufficiently serious).

The subjective component, however, presents an insurmountable obstacle for Williams. "'In failure to protect cases, a prisoner normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat

7

to his safety.'" *Gevas*, 798 F.3d at 480 (alteration omitted) (nested quotation marks omitted) (quoting *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996) (per curiam)). "[G]eneralized, vague, or stale concern[s] about one's safety" typically will not do, but identifying "a specific, credible, and imminent risk of serious harm" typically will. *Id.* at 481.

Here, it is indisputable that the book-in officers (or any other Jail officer) never received any specific, credible report of risk from Williams because, at the time he was booked into the Jail, Williams admits to having only a generalized fear of danger from being placed in the general population. Until just before or just after his assault, Williams did not know that T-Bone was at the Jail, that Grundy was at the Jail, or that Jail inmates had been communicating with Hurst outside the Jail. Williams Dep. 38:1–39:1, 44:13–45:14, 87:1–11.

Even if Williams had known any of these things, he does not claim to have communicated them to the book-in officers or any other Jail officer. He communicated only a nonspecific wish to be placed in segregation. No reasonable jury could infer from this evidence that the book-in officers were thereby made aware of impending harm to Williams if his request was not honored. *See Grieveson*, 538 F.3d at 776 (citing *Butera v. Cottey*, 285 F.3d 601, 606–07 (7th Cir. 2002)) ("Grieveson never informed the jail officers of a specific threat to his life (*i.e.*, that he was at risk because of his 'snitch' reputation). Instead, he told jail officials only that he was afraid and that he wanted to be moved.").

One may speculate that Jail records might have disclosed one relevant predicate fact: that Williams had previously been kept in segregation as a cooperating witness. But there is no evidence at all of the Jail's record-keeping, and Williams's vague reports that the book-in officers told him the Jail's classification department "knew everything" does not, in context, give rise to a nonspeculative inference that the Jail's classification department knew of Williams's prior placement. And even if it had, there is no evidence that the book-in officers shared that knowledge, nor a nonspeculative inference from such knowledge, without more, that Williams was still at continuing risk of retaliation, five years after leaving the Jail for Wabash Valley.

Williams correctly points out that "[subjective] deliberate indifference can be predicated upon knowledge of a victim's particular vulnerability (though the identity of the ultimate assailant not known in advance of attack), or, in the alternative, an assailant's predatory nature (though the identity of the ultimate victim not known in advance of attack)." *Brown*, 398 F.3d at 915. Neither path takes Williams where he wants to go, however. As just explained, the evidence does not permit a finding that any Jail officer was aware of Williams's history of cooperation, nor that such history rendered Williams particularly vulnerable to assault. And there is no evidence that any Jail officer was aware of the predatory nature of any of Williams's assailants, such that the officer would be chargeable with knowledge that "'all prisoners in [Williams's] situation face[d]'" risk of assault. *Id.* (quoting *Farmer*, 511 U.S. at 843).

Similarly, Williams's testimony that other inmate assaults had occurred at the Jail is insufficient to show the Jail officers' knowledge that he was particularly vulnerable to

9

assault or that all Jail inmates risked harm from a particularly predatory assailant. Rather, such testimony, without more—and particularly absent any connection to Williams or his assailants specifically—does not go beyond showing "'the inherent, as it were the baseline, dangerousness of [Jail] life.'" *Grieveson*, 538 F.3d at 776 (quoting *Case v. Ahitow*, 301 F.3d 605, 607 (7th Cir. 2002)).

II. **Defendants Have Not Carried Their Burden to Show the Absence of a Genuine Dispute of Material Fact Relative to the Control-Booth Officers**

"A party seeking summary judgment bears an initial burden of proving there is 'no material question of fact with respect to an essential element of the non-moving party's case.'" *MMG Fin. Corp. v. Midw. Amusements Park, LLC*, 630 F.3d 651, 657 (7th Cir. 2011) (quoting *Delta Consulting Grp., Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1137 (7th Cir. 2009)); *also* Fed. R. Civ. P. 56(a). In other words, the moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. "If the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision." *Leong v. SAP Am., Inc.*, 67 F. Supp. 3d 972, 981 (N.D. Ill. 2014) (citing *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1182 (7th Cir. 2013); *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006)).

Here, paragraphs two and three of Williams's amended complaint identify Defendants Herman Castellon and Timothy Ross as the control-booth officers, Am.

Compl. ¶¶ 2–3, and paragraph twenty-one alleges, "The assault started before the evening trays were returned. To not be aware of the actions in [the cell block] during feeding is beyond deliberate. Deputies Herman Castellon and Timothy Ross were assigned to [the] control booth." *Id.* ¶ 21. And in the portions of Williams's depositions designated by Defendants, there is the following exchange:

> Q. [A]re you able to tell me why you sued Herman Castellon in this lawsuit?
> A. . . . I'm going for the officer in the booth. . . .
> Q. Okay. . . . [Y]ou're trying to sue the officer that was in the control booth at the time you were attacked?
> A. Yes, and the—I'm going after the book-in officers also.
> Q. Okay. And . . . why is it that you're trying to after the officer who was in the control booth at the time you were attacked?
> A. [Williams's explanation follows.]
> Q. So let me make sure I understand that. So is it your contention in this lawsuit that the officer in the control booth should have seen you being attacked by other inmates?
> A. Yes.
> Q. And that's the reason you're going after the officer in the control booth?
> A. Yes.

Williams Dep. 115:18–117:4.

However, no mention is made of the control-booth officers' potential liability in Defendants' briefing. Defendants' statement of material facts not in dispute, *see* S.D. Ind. L.R. 56-1(a), does not make any reference to the control-booth officers or what they might have observed on June 16, 2015. Thus, Williams's default admission of

11

Defendants' facts by failing to respond to them, *see* S.D. Ind. L.R. 56-1(f)(1), leaves his claim against the control-booth officers unimpaired.

In other words, as to the control-booth officers, Defendants have not discharged their "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which [they] believe[] demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. As to these Defendants, the burden of production never shifted to Williams, and he was not obligated to raise genuinely disputed material facts in opposition. *Leong*, 67 F. Supp. 3d at 981.

This is not a merely technical point (though even if it were, we would still be obligated to deny Defendants' motion). Portions of Williams's testimony designated by Defendants explain Williams's belief, and the grounds for it, that his assault would have been visible to the control-booth officers and actually viewed by them. Specifically, Williams pointed to the Jail's nearly exclusive reliance on security cameras to observe inmate behavior; the heightened intensity of such observation during meal times; the visibility of that part of the day room where Williams was initially assaulted to the security cameras; and his own familiarity with control-booth procedures and security-camera coverage flowing from his detention in 2009–2010 in a cell behind the control booth, from which Williams was often able to peer inside.

As the court explained in *Grieveson*,

> [i]f Officer Highbaugh did witness an inmate assault, but failed to intervene, his actions would seemingly "constitute a paradigm case of deliberate indifference." *Haley v. Gross*, 86 F.3d 630, 642 (7th Cir.1996). The evidence presented by Grieveson . . . establishes a genuine issue of material fact on

> both prongs of the deliberate indifference inquiry. . . . Grieveson allegedly was assaulted by other inmates—an objectively serious danger that posed a substantial risk of serious harm to him—in the presence of Officer Highbaugh. . . . Officer Highbaugh allegedly watched the assault but did not intervene to protect Grieveson—exhibiting quintessential deliberate indifference.

538 F.3d at 778. Accordingly, Defendants have not shown their entitlement to judgment as a matter of law as to the control-booth officers. Their motion for summary judgment must be to that extent denied.

### **Conclusion and Order**

For the reasons explained above:

Defendants' motion for summary judgment is GRANTED as to the book-in officers' liability.

Defendants' motion for summary judgment as DENIED as to the control-booth officers' liability.

IT IS SO ORDERED.

Date: 9/25/2018

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Tara Lynn Gerber
City of Indianapolis
tara.gerber@indy.gov

John Andrew Goodridge
JOHN ANDREW GOODRIDGE LAW OFFICE
jagoodridge@jaglo.com

Andrew J. Upchurch
OFFICE OF CORPORATION COUNSEL
andrew.upchurch@indy.gov